IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| S. GARETH GRAHAM, | : | |
| Plaintiff | : | Civil Action No. 1:05-CV-2679 |
| | : | |
| v. | : | (Chief Judge Kane) |
| | : | |
| JUDGE GEORGE E. HOFFER et al., | : | |
| Defendants | : | |

**MEMORANDUM**

Before the Court is Defendants' motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (Doc. No. 32.)  For the reasons that follow, the motion will be granted.

I.   BACKGROUND

   A.   Factual Background

At all times relevant to the instant motion, Plaintiff Gareth Graham ("Graham") worked as an employee of the Cumberland County Probation Office.  Before 1998, Graham held an administrative and supervisory position in the Juvenile Probation Department.  (Doc. No. 1 ¶¶ 20, 22-23.)  One employee Graham supervised was Barbara Varner, a woman with whom Graham allegedly had engaged in an "illicit consensual affair" for several years prior to becoming her supervisor.  (Doc. No. 1 ¶¶ 20, 25.)  Graham alleges that he broke off the relationship as soon as he became Varner's supervisor, and she took her revenge by accusing him of sexual harassment.  (Doc. No. 1 ¶ 25.)  In 1998, following Varner's accusations against Graham, President Judge George Hoffer stated that he had "lost confidence" in Graham and "demoted" him to the position of institutional probation officer at the Cumberland County Prison.  (Doc. No. 1 ¶ 23.)

Varner initiated formal administrative proceedings to complain of Graham's workplace behavior. (Doc. No. 1 ¶ 18.) After exhausting the administrative proceedings, Varner filed a federal civil action in April 2001 against Graham, his immediate supervisor Joseph Osenkarski, the Commonwealth of Pennsylvania, the Ninth Judicial District in Cumberland County, and Cumberland County, in which she alleged that she was subject to discrimination and sexual harassment. (Doc. No. 1 ¶ 19.) Graham, according to the allegations in the complaint, "pursued a vigorous defense of Varner's accusations, proffer[ed] evidence about Varner that would have persuaded a finder of fact to conclude that Graham had indeed had intimate contact with Varner and had indeed been a visitor to Varner's personal residence on a number of occasions, both conclusions which Varner vehemently denied." (Doc. No. 1 ¶ 26.)

Three years later, pursuant to a settlement agreement between Varner and the institutional defendants—Graham and Osenkarski were not parties to the agreement—Varner dismissed the federal action with prejudice. (Doc. No. 1 ¶¶ 27-30.) Under the terms of the settlement agreement, the County and Court agreed that Varner would "never again be placed under the direct supervision of Gary Graham or Joseph Osenkarski," and that Graham would be "required to seek permission to enter the Courthouse, and, upon entry into the Courthouse, will be required to proceed through full security screening conducted by Sheriff and Courthouse security personnel." (Doc. No. 1 ¶ 31; Ex. A ¶ 14.)

On March 5, 2004, John Roller, the Chief Adult Probation Officer, sent a letter informing Graham that he would need to obtain Roller's permission before coming to the Courthouse or, if Roller was absent, Graham would need to obtain the permission from his supervisors Lyle Herr and Mike Varner. (Doc. No. 1 ¶ 33; Ex. B.) On March 26, 2004, Graham sought and received

Roller's permission to enter the Courthouse in order to participate in a union vote to take place on April 14, 2004. (Doc. No. 1 ¶¶ 38, 39.) When Graham actually came to the Courthouse on April 14, however, the Sheriff's office barred him from entering until they determined that permission had been granted. (Doc. No. 1 ¶ 40.)

During the fall of 2004, the County and the Probation Officers' union began negotiating a collective bargaining agreement. (Doc. No. 1 ¶ 49.) At some point during the negotiations, the County proposed that adult probation officers work on-call outside of regular work hours, on a rotating basis for overtime pay. (Id.) According to Graham, this proposal would have excluded him, and only him, because he was assigned to the prison. (Doc. No. 1 ¶ 50.) After threats of litigation by the Probation Officers' union, the County's proposal was withdrawn and another arrangement was incorporated into the agreement in June 2005. (Doc. No. 1 ¶¶ 54, 55.) Though the County's proposal was never adopted, Graham alleges that it was crafted with the purpose of humiliating him and in retaliation for the Varner lawsuit.

Under the proposal that was eventually adopted in the agreement, procedures were implemented for officers to work on-call in a rotating manner taking seniority into account. In addition, the procedures "contemplated . . . that on-call work might require the on-call officer, in the performance of his or her duties, to enter the Courthouse and the adult probation officer area during non-business hours." (Doc. No. 1 ¶ 55.) Despite the adoption of these procedures, Roller provided Graham with a memorandum on June 10, 2005, in line with earlier restrictions on his access to the courthouse, indicating that a "special protocol" would be established when Graham would be required to enter the Courthouse and adult probation officer area during non-business

hours. (Doc. No. 1 ¶ 57.) That special protocol was "approved" by Judge Bayley, and initialed by Graham's supervisors. (Doc. No. 1 ¶ 57.)

Under the special protocol, Graham would be required to contact Roller or, in the alternative, one of his other supervisors, for permission to enter the courthouse. If he received permission, Graham would be required to notify security about the expected time of his arrival, and while he was present in the courthouse, Graham would be "accompanied by security personnel at all times." (Doc. No. 1 Ex. D.) Graham alleges that this special protocol applies only to him, and was established in an effort to embarrass him and to retaliate against him. (Doc. No. 1 ¶ 63.) And, despite his efforts, Graham has as of yet been unable to persuade Judge Bayley to lift the restrictions established by the special protocol. (Doc. No. 1 ¶ 68.)

### B.  Procedural Background

On December 28, 2005, Graham filed a complaint in this Court, naming as defendants: the Commonwealth of Pennsylvania, the Ninth Judicial District, and Judges George Hoffer and Edgar Bayley (collectively, "Commonwealth Defendants"); as well as Cumberland County, County Commissioners Bruce Barclay, Gary Eichelberger, and Richard Rovegno, Sheriff R. Thomas Kline, and Graham's supervisors John Roller, Michael Varner, and Lyle Herr (collectively, "County Defendants"). (Doc. No. 1.) Thereafter, the County Defendants filed a motion to dismiss on February 10, 2006, (Doc. No. 8), and the Commonwealth Defendants filed a motion to dismiss on February 28, 2006 (Doc. No. 11). Graham did not file a brief in opposition to the Commonwealth Defendants' motion.

In a memorandum opinion and order dated December 28, 2006, this Court ruled upon Defendants' motions. (Doc. No. 18.) Because Graham failed to timely oppose the

Commonwealth Defendants' motion to dismiss, and after consideration of its merits, the Court granted the motion to dismiss as unopposed pursuant to Local Rule 7.6. (Doc. No. 18, at 4-5, 10.) The Court granted in part and denied in part the County Defendants' motion, dismissing Graham's claims related to his 1998 demotion, his §§ 1985 and 1986 claims, and his claims for punitive damages against the County Defendants in their official capacities. (Doc. No. 18, at 10-11.) Accordingly, the only remaining defendants in this action are the County Defendants.

On January 29, 2007, Graham took an interlocutory appeal of this Court's order to the United States Court of Appeals for the Third Circuit. And on February 13, 2007, the County Defendants filed an answer to Graham's complaint. (Doc. No. 23.)

On March 13, 2007, the Defendants filed the instant motion for judgment on the pleadings (Doc. No. 32) and submitted a brief in support of the motion (Doc. No. 33). That same day, this Court issued an order staying the case pending the resolution of Graham's appeal. (Doc. No. 34.) On August 16, 2007, upon learning that the Third Circuit dismissed Graham's appeal for failure to comply with the applicable rules on appeal, this Court lifted the stay and directed that Graham file brief in opposition to the motion. (Doc. No. 37.) Graham filed a summary of his position without supplying any legal analysis or a single legal citation in support of his claims. (Doc. No. 37.) Defendants timely replied. (Doc. No. 38.)

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(c), once the pleadings are closed, but within such time as to not delay trial, a party may move for judgment on the pleadings. The standard of review for a motion for judgment on the pleadings is identical to that of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). <u>Turbe v. Gov't of Virgin Islands</u>, 938

F.2d 427, 428 (3d Cir. 1991). The only difference is that, on a motion for judgment on the pleadings, the Court reviews not only the complaint, but also the answer and written instruments attached to the pleadings. 2 James Wm. Moore et al., Moore's Federal Practice – Civil § 12.38.

Just as required by a motion to dismiss, the Court will accept the factual allegations as true and draw all reasonable inferences presented in the pleadings in the light most favorable to plaintiffs. Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004). If the facts alleged are sufficient to "raise a right to relief above the speculative level" such that the plaintiff's claim is "plausible on its face," a complaint will survive a motion to dismiss, Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1974 (2007), or a motion for judgment on the pleadings, Turbe, 938 F.2d at 428. The Court should consider the allegations in the pleadings, the exhibits attached thereto, matters of public record, and "undisputedly authentic" documents if plaintiff's claims are based on such documents. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196-97 (3d Cir. 1993).

### III.   DISCUSSION

Graham's remaining claims in this action are made solely pursuant to 42 U.S.C. § 1983, claiming that Defendants deprived him of certain constitutional rights based on three separate allegations: (1) the imposition of restrictions on his ability to enter the courthouse; (2) the physical detention by court security on April 14, 2004; and (3) the alleged attempt to deny Graham certain overtime opportunities in a proposed collective bargaining agreement. The Defendants have raised qualified immunity as an affirmative defense to these claims, (Doc. No. 23 ¶ 80), and even accepting Graham's allegations as true, a qualified immunity defense can appear on the face of a complaint. Leveto v. Lapina, 258 F.3d 156, 162 (3d Cir. 2001). Under

the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The qualified immunity defense is evaluated with a two-step process. "The first step is to determine whether the alleged facts, taken in the light most favorable to the plaintiff, show a constitutional violation." Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002). If no constitutional violation has occurred, the qualified immunity inquiry is at an end and the official is entitled to immunity. Id.

    A.    **Access-to-Workplace Claims**

In his complaint, Graham claims that the Defendants deprived him of his due process rights by restricting his "freedom of access" to the courthouse and by imposing additional security measures on him. (Doc. No. 1 ¶ 71a.) While the Defendants challenged Graham's assertions on the ground that the policies in place did not hinder his ability to pursue a legal claim, Graham concedes that Defendants have not impinged on his right to access the courts to pursue legal claims; he claims instead that the Defendants restricted his access to his place of employment, which, in this case, happens to be the Cumberland County Courthouse. (Doc. No. 37 at 3.)

As an initial matter, the Court notes that, the Supreme Court has never found "that a right of governmental employment per se is fundamental." Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 313 (1976). In addition, like other employers, the "Government has the right to exercise control over access to the federal workplace in order to avoid interruptions to the performance of the duties of its employees." Cornelius v. NAACP Legal Def. & Educ. Fund,

Inc., 473 U.S. 788, 805-06 (1985). Thus, while Graham may claim that the restrictions deprived him of his freedom of access, neither his brief in opposition nor the Court's own research has discovered any case granting a right of unhindered access to a place of governmental employment. On this point, the fact that his place of governmental employment happened to be a court does not alter the analysis.

Though the Supreme Court has recognized a fundamental right of access to the courts, Tennessee v. Lane, 541 U.S. 509, 523 (2004), it is also clear from the pleadings that the security restrictions in place reducing Graham's ability to enter and move about the courthouse did not actually deprive him of that fundamental right. Due process requires that "'within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard' in its courts." Id. at 532 (quoting Boddie v. Connecticut, 401 U.S. 371, 379(1971)). The Court simply cannot find any indication that he was denied such an opportunity. Even when accepting the allegations in the complaint as true, they do not raise a right to relief above a speculative level. Accordingly, Graham's right of access claims will be dismissed.

**B.     Equal Protection Claim**

Graham seems to claim in his complaint that he was denied equal protection of the laws when the County placed extra security screening requirements on his entry and movements in the courthouse after the termination of the lawsuit against him. (Doc. No. 1 ¶ 71a.) This is confirmed by the Graham's brief in opposition, where he states that "Plaintiff's position is that . . . . Treatment of him in a dissimilar and discriminatory way certainly presents a question . . . whether he has made out an Equal Protection claim." (Doc. No. 37 at 5.)

The Supreme Court has recognized that a plaintiff can bring a valid claim under the equal protection clause even as a "class of one." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). To state a claim under this theory, the plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment. Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006). Although the Third Circuit has recently relaxed the "class of one" pleading standards, not requiring any allegations of specific instances of differential treatment, the complaint still must contain allegations that the defendants treated the plaintiff differently from other similarly situated individuals. Phillips v. County of Allegheny, 515 F.3d 224, 244-245 (3d Cir. 2008) (citing DeMuria v. Hawkes, 328 F.3d 704, 707 (2d Cir. 2003)).

Here, with regard to the similarly situated requirement, Graham only alleges that he was treated differently from all other employees. He states that "[a]ll other County employees may enter the Courthouse freely without seeking permission from anyone. All other Courthouse employees may enter the Courthouse without undergoing any security screening by Sheriff and Courthouse personnel." (Doc. No. 1 ¶ 32.) He makes similar allegations with regard to other probation officers, stating that "[a]ll other probation office employees may enter the Courthouse freely." (Doc. No. 1 ¶ 60.) Graham argues that these allegations regarding treatment of other courthouse and probation employees satisfy the similarly situated requirement because "[w]hen the sexual harassment suit was settled without a finding or admission of liability, it is submitted that Plaintiff was back in the pack again, that he was just the same as all other county employees." (Doc. No. 37 at 4.)

Similarly situated employees are those who "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Terrell v. City of Harrisburg Police Dept., 549 F. Supp. 2d 671, 681-82 (M.D. Pa. 2008). For an employee to be similarly situated, almost "all relevant aspects of employment need to be nearly identical." Red v. Potter, 211 Fed. Appx. 82, 84 (3d Cir. 2006) (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)). Accordingly, work history, such as the employee's disciplinary record, should be considered. See Barry v. Luzerne County, 447 F. Supp. 2d 438, 452 (M.D. Pa. 2006).

Here, the prior allegations of sexual harassment certainly places Graham in a different position than his co-workers. Indeed, employers can be liable for a supervisor's sexual harassment "where its own negligence is a cause of the harassment. An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 758-59 (1998). Accordingly, the Court rejects Plaintiff's submission that he was "back in the pack" once the sexual harassment claim against him was settled. As such, he has failed to state a claim that he was treated differently from similarly situated individuals, and his equal protection claims will be dismissed.

### C.   Fourth Amendment Detention Claim

Graham next claims that the Defendants detained and confined him against his will when he attempted to enter the courthouse on April 14, 2004. (Doc. No. 1 ¶ 71(b).) He argues that this detention constituted an unreasonable seizure in violation of his Fourth and Fourteenth Amendment rights. Graham alleges specifically that the Sheriff's Office barred him from

entering the courthouse when he arrived on April 14 until they were able to confirm that he had received permission to do so.  (Doc. No. 1 ¶ 40.)[1]

False imprisonment claims brought pursuant to § 1983, which are "based on an arrest made without probable cause[, are] grounded in the Fourth Amendment's guarantee against unreasonable seizures."  Groman v. Twp. of Manalapan, 47 F.3d 628, 636 (3d Cir. 1995).  But, the Fourth Amendment only protects against *unreasonable* searches and seizures, and reasonability varies depending on the context in which the intrusion takes place.  In fact, "neither a warrant nor probable cause, nor indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance."  National Treasury Employees Union v. Von Raab, 489 U.S. 656, 674-676 (1989).  If a Fourth Amendment intrusion serves special governmental needs beyond normal law enforcement, "it is necessary to balance the individual's privacy expectations against the Government's interest to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context."  Id.  Several courts have recognized that a courthouse is a location that merits a relaxed reasonableness standard under this analysis,[2] including the Supreme Court, which has stated "where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as "reasonable"– for examples, searches now routine at airports and at

---

[1] It appears that what Graham really takes issue with is not the actions of the sheriffs's deputies enforcement of Chief Roller's order, but rather a condition of employment that restricts his comings and goings and subjects him to unique treatment.  The wisdom or propriety of such a restriction of employment is not before the Court.  The pleadings suggest that the court and probation office were attempting to diffuse a highly charged atmosphere involving two long term employees of the court so that both could continue their employment.  Apparently, the restrictions on Graham's movements were determined to be the most workable solution to a very sensitive problem.

[2] See, e.g., Downing v. Kunzig, 454 F.2d 1230, 1232 (6th Cir. 1972); Norwood v. Bain, 166 F.3d 243, 249 (4th Cir. 1999); Wilkinson v. Forst, 832 F.2d 1330, 1339 (2nd Cir. 1987).

entrances to courts and other official buildings." Chandler v. Miller, 520 U.S. 305, 323 (1997) (citing Von Raab, 489 U.S. at 674-676).

Here, Graham claims the detention lasted for "an extended period of time," but admits that he was only stopped "until other employees from the Sheriff's office were able to discover that Roller had in fact sent written permission to the Sheriff and that the Sheriff had indeed received this written permission." In short, Graham was detained in this instance so that the sheriff's deputies could determine his compliance with Chief Roller's March 5, 2004 memo, issued to preserve security and order in the county courthouse. After the deputies determined he had obtained permission as required, he was allowed to enter. Clearly, the actions of the sheriff's deputies do not exceed constitutional limits on detention.

Accordingly, Graham's claims based on his detention at the entrance to the courthouse will be dismissed.

### D. First Amendment Retaliation Claims

Graham next alleges in his complaint that the Defendants' put forward a proposal during negotiations of the collective bargaining agreement that would have excluded Graham from overtime in retaliation for his role in the sexual harassment lawsuit, seemingly asserting a violation of his First Amendment rights. In his brief in opposition, Graham concedes that he "does not claim it was his vigorous defense of [the] sexual harassment suit which brought about the retaliation and harassment against him." (Doc. No. 37 at 4.) Instead, he clarifies that "[i]t was simply the fact that he was named a defendant in that law suit [sic] which caused the County and Court to retaliate against him." (Id.)

To plead a valid First Amendment retaliation claim, a public employee must show that (1) he was engaged in a constitutionally protected speech activity and that (2) the protected activity was a substantial factor in the alleged retaliatory action. Hill v. Borough of Kutztown, 455 F.3d 225, 242 (3d Cir. 2006).

Here, the claim fails to meet the first part of the test for retaliation. Graham concedes that the Defendants did not retaliate against him because of his defense of the sexual harassment lawsuit, but merely for being named as a defendant in the sexual harassment lawsuit. Neither Graham nor the Court's own research has turned up any cases that suggest a person's mere status as a defendant in a lawsuit is a constitutionally protected speech activity, however. This makes sense because "the reason why such retaliation offends the Constitution is that it threatens to inhibit the exercise of the protected right." Crawford-El v. Britton, 523 U.S. 574, 589 n.10 (1998). Graham was necessarily not exercising any rights when he was named as a defendant in the sexual harassment case because he had no choice in the matter. In fact, it would seem that being named as a defendant required no action on Graham's part whatsoever in light of his absolute denial of the accusations of sexual harassment and discrimination underlying that lawsuit. (Doc. No. 1 ¶ 25.) As such, there is no danger that retaliation for his status as a defendant would chill speech.

Further, the proposal was never accepted, and Graham was allowed to take advantage of the overtime pay system that was eventually integrated into the new collective bargaining agreement (Doc. No 1. ¶ 56), though special security arrangements were placed on his access to the courthouse. Given the resolution of the access-to-workplace and Fourth Amendment claims, however, it is clear that these restrictions were appropriate under the circumstances.

Accordingly, there is no cognizable violation of Graham's First Amendment rights and the retaliation claims will be dismissed.

### F.     Plaintiff's Due Process Claims

Finally, Plaintiff asserts that the Defendants violated his due process rights "by depriving Graham of his liberty without due process of law by restricting his freedom of access to the Cumberland County Courthouse and by imposing extra security screening requirements on Graham."  While it is not clear from the complaint, Graham argues in his brief in opposition that he has made a claim that both his procedural and substantive due process rights were violated by the Defendants' conduct. (Doc. No. 37 at 7.)  Here, again, Graham's quarrel appears to be with the action's taken by Defendants' to diffuse the preserve security and order in the county courthouse.

#### 1. Procedural Due Process

Plaintiff argues that "[he] never got a chance to contest or respond to the placement of arbitrary restrictions upon his access to the Courthouse.  This seems to be a distinct denial of procedural due process.  And it was a liberty interest which was violated when these restrictions were put into place." (Doc. No. 37 at 7.)

A state may not authorize the deprivation of a protected liberty or property interest without providing a procedure in connection with that deprivation.  <u>Sample v. Diecks</u>, 885 F.2d 1099, 1114 (3d Cir. 1989)   A plaintiff bringing a § 1983 claim based upon the due process clause must allege: (1) that he was deprived of a protected liberty or property interest; (2) that this deprivation was without due process; (3) that the defendant subjected the plaintiff, or caused the plaintiff to be subjected to, this deprivation without due process; (4) that the defendant was

acting under color of state law; and (5) that the plaintiff suffered injury as a result of the deprivation without due process.  Id.  The Defendants contend that Graham has failed to allege the first requirement.

Graham claims specifically that his liberty interest was deprived without due process. Procedural due process is required before government deprivation of a broad scope of liberty interests, including "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge . . . and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.  Baraka v. McGreevey, 481 F.3d 187, 209 (3d Cir. 2007) (quoting Meyer v. Nebraska, 262 U.S. 390, 399, (1923)).

Given the Court's disposition of Graham's other claims, it is clear that the Defendants' conduct at issue has not deprived Graham of any constitutionally protected liberty interest in these circumstances.  The Defendant's restrictions on access did not deprive Graham of his ability to continue his occupation or restrain him in a way that violated any of his constitutional rights.  Accordingly, Graham cannot sustain a claim against the Defendants for failure to provide procedural due process for these actions and the claims will be dismissed.

### 2. Substantive Due Process

As mentioned above, Graham's complaint is not clear that he has alleged any substantive due process claim.  He argues in his brief in opposition that "the government actions constituted an arbitrary and deliberate abuse of power.  Not only was there a denial of procedural due process, but also Plaintiff's substantive due process have [sic] been violated."  (Doc. No. 37 at 1.)

The core concept of due process is "protection against arbitrary action." County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998). A person's substantive due process rights can only be violated by governmental employees when their conduct amounts to an abuse of official power that is so ill-conceived or malicious that it "shocks the conscience." Fagan v. City of Vineland, 22 F.3d 1296, 1303 (3d Cir. 1994) (citing Collins v. City of Harker Heights, 503 U.S. 115 (1992)). "The exact degree of wrongfulness necessary to reach the conscience-shocking level depends upon the circumstances of a particular case." Nicini v. Morra, 212 F.3d 798, 809-10 (3d Cir. 2000) (quoting Millier v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999)).

Here, the Court can only assume that Graham claims the Defendants violated his substantive due process rights by the same conduct that underlies his other claims based on the First and Fourth Amendment, and the Equal Protection Clause. As discussed above, these actions either did not violate Graham's constitutional rights or were entirely reasonable given the circumstances. Because the Defendants' acted reasonably, there is no basis to state a claim that these actions shocked the conscience. Accordingly, the complaint's factual allegations do not raise a right to relief above the speculative level on this claim, and dismissal is appropriate. See Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007).

**G. No Violation of Clearly Established Rights**

Because the Court has not found that Graham has alleged a valid constitutional violation, the Defendants' are entitled to qualified immunity for this conduct. But, even assuming *arguendo* that any of the conduct at issue violated Graham's constitutional rights, the Defendants are still clearly entitled to qualified immunity for this conduct. If a constitutional violation has been adduced, "courts evaluating qualified immunity move to the second step of the analysis to

determine whether the constitutional right was clearly established." Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002). When making this determination, "[t]he ultimate issue is whether . . . reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." Leveto v. Lapina, 258 F.3d 156, 162 (3d Cir. 2001) (citing Good v. Dauphin County Soc. Servs. for Children & Youth, 891 F.2d 1087, 1092 (3d Cir. 1989).

As to the seizure on April 14, 2004, there is no doubt that the Fourth Amendment's prohibition on unreasonable searches is clearly established, but given the above discussion, it is certainly not clearly established that the Defendants' conduct in initiating a stop at the entrance to the courthouse was a violation of that right. Given the case law on the subject, the Defendants' certainly could have reasonably believed that they had a right to detain Graham before he could be permitted to enter the courthouse. As such, qualified immunity attaches to the Defendants' conduct.

As to the security restrictions in general, it is clear that the Defendants' acted reasonably to impose limitations on Graham after the sexual harassment lawsuit was initiated against him. Given the potential liability implications of taking no precautions, see Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 758-59 (1998), the Defendants acted appropriately and reasonably to take precautions assuming that they had a duty to ensure no more potential Title VII claims would occur. Accordingly, it was reasonable for them to assume their conduct was lawful.

As to the retaliation claims, the proposal that would have excluded Graham from overtime work was never even adopted. Clearly it was reasonable for the County to assume that it could freely bargain with the probation officer's union in coming to terms for a new collective

bargaining agreement. Further, Graham was never harmed by this proposal, as the overtime system that was eventually adopted included him. Though special restrictions and limitations were placed on his access to the Courthouse, these restrictions were reasonable as discussed above, and the Defendants are entitled to qualified immunity for these actions.

### H. Leave to Amend

In civil rights cases, district courts must generally *sua sponte* extend plaintiffs an opportunity to amend before dismissing a complaint pursuant to Rule 12(b)(6) (and presumably 12(c)). Fletcher-Harlee Corp. v. Pote Concrete Contractors, 482 F.3d 247, 252 (3d Cir. 2007). A court can refuse to permit a curative amendment on grounds of bad faith, undue delay, prejudice, or futility, however. Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004).

Here, because the Court has found that the Defendants are entitled to qualified immunity for any claims based on (1) the imposition of restrictions on his ability to enter the courthouse and (2) the physical detention by court security on April 14, 2004, and (3) the alleged attempt to deny Graham certain overtime opportunities in a proposed collective bargaining agreement, any amendment as to the claims based on these actions would be futile. As such, leave to amend will not be extended and the complaint will be dismissed.

### IV.   CONCLUSION

For the foregoing reasons, the Defendants' motion for judgment on the pleadings will be granted. Plaintiff will not be given leave to amend his complaint because any amendment would be futile. An order consistent with this memorandum will follow.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| S. GARETH GRAHAM, | : | |
| Plaintiff | : | Civil Action No. 1:05-CV-2679 |
| | : | |
| v. | : | (Chief Judge Kane) |
| | : | |
| JUDGE GEORGE E. HOFFER et al., | : | |
| Defendants | : | |

## ORDER

**AND NOW**, this 30th day of September 2008, upon consideration of the Defendants' motion for judgment on the pleadings (Doc. No. 32) and for the reasons set forth in the Court's Memorandum Opinion filed herewith, **IT IS HEREBY ORDERED** that the motion is **GRANTED**.

All of Plaintiff's remaining claims based on 42 U.S.C. § 1983, for: (1) the imposition of restrictions on his ability to enter the courthouse; (2) the physical detention by court security on April 14, 2004; and (3) the alleged attempt to deny Graham certain overtime opportunities in a proposed collective bargaining agreement are **DISMISSED** against all Defendants. Because any amendment to these claims would be futile, the Court will not grant leave to amend.

**ACCORDINGLY, IT IS FURTHER ORDERED** that the complaint will be **DISMISSED** in its entirety. The clerk is directed to close the case.

 s/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania